Ralph Duvall Morse v. Commissioner.
Morse v. Commissioner
Docket No. 45627.
United States Tax Court
T.C. Memo 1955-22; 1955 Tax Ct. Memo LEXIS 308; 14 T.C.M. (CCH) 77; T.C.M. (RIA) 55022; January 31, 1955
*308 Held, respondent failed to prove that petitioner's return for 1943 was fraudulent with intent to evade tax. Assessment and collection of any deficiency is, therefore, barred by the statute of limitation since more than three years elapsed from the filing of the return and the mailing of the deficiency notice. Thomas M. Wilkins, Esq., Union Trust Building, Washington, D.C., for the petitioner. Peter K. Nevitt, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion This proceeding involves a deficiency in income and victory tax for the year 1943 in the amount of $14,339.69, and a penalty asserted under section 293(b) of the 1939 Code in the amount of $7,169.84, determined against Ralph Duvall Morse (hereinafter referred to as the petitioner). The issues to be determined are: (1) whether petitioner received $25,000 of additional income in 1943 from a corporation of which he was an officer; (2) whether petitioner realized capital gain of $800 in 1943 from the sale of stock; and (3) whether any part of the deficiency in petitioner's tax for that year was due to fraud with intent to evade tax, thus removing the bar of the statute of limitation *309 to the assessment and collection of such deficiency. Some of the facts were stipulated. Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. Petitioner was a resident of Grand Rapids, Michigan, in 1943 and filed his Federal income and victory tax return for that year, on the cash basis, with the collector of internal revenue for the district of Michigan. Prior to 1942, petitioner had manufactured furniture through the Ralph Morse Furniture Company (hereinafter referred to as the furniture company), a corporation, most of whose stock he owned. Because of wartime restrictions on materials, the furniture company's production dropped severely in 1942, and petitioner made several trips to Washington, D.C., in an effort to secure a contract for it to produce war goods. On a trip to Washington in September 1942, it was suggested to him that he contact the Hayes Manufacturing Corporation (hereinafter referred to as Hayes) which was making parachutes in Grand Rapids. Upon his return, he talked with one Beach Gill (hereinafter referred to as Gill), the head of Hayes' parachute division. Gill though it might be possible for the furniture *310 company to make the packs in which the parachutes are contained. Gill inspected the furniture company's plant and equipment, and decided that its sewing machines were not large enough to sew the packs. He offered to lend it some of Hayes' machines, and petitioner agreed that the furniture company would purchase a few larger machines. Hayes gave the furniture company an initial order for packs. The furniture company spent some $4,141.74 to ready its plant for pack production. A short time thereafter, Gill suggested to petitioner that it might be better to form a new corporation to manufacture the packs which would lease a part of the furniture company's plant. Petitioner agreed to work for the new corporation for a salary of $12,000 per year. Gill's attorney from New York City, one MacNeil Mitchell (hereinafter referred to as Mitchell), came to Grand Rapids and discussed the proposed plan with petitioner and Gill. Petitioner was made to appear as the organizer of the new corporation. He addressed a letter to Mitchell at the latter's suggestion on September 26, 1942, asking him to form a Delaware corporation, 20 per cent of whose stock petitioner would own - the rest to be owned *311 by persons whom he had not theretofore known, but who were brought into the arrangement by Gill and Mitchell. A corporation, the Parapart Corporation (hereinafter known as Parapart), was incorporated under the laws of Delaware on September 30, 1942; and petitioner had assigned to it the furniture company's order for packs from Hayes in consideration of the $4,141.74 which the furniture company had spent in readying its plant. Parapart leased a part of the furniture company's plant for an annual rental of $2,100. For about a week petitioner was Parapart's president, and thereafter he was its vice-president. One James W. Kane was its president, and one Louise Tiedje, the sister-in-law of Hayes' comptroller, was its treasurer. Petitioner had no real executive duties. Louise Tiedje kept the books of Parapart and held all of the remaining 80 per cent of Parapart's stock. She refused to allow petitioner to inspect the books and when petitioner complained to Kane, he was told to "forget it". On February 1, 1943, February 15, 1943, and March 16, 1943, four checks, one in the amount of $10,000 and three for $5,000 drawn by Parapart on its New York City bank, the Colonial Trust Company, were *312 cashed by that bank upon presentation of the checks. The checks were dated January 20, 1942, January 30, 1942, February 15, 1942, and March 10, 1942. The were all drawn payable to petitioner and endorsed by him. Over his endorsement was typed: "First [second, third, or fourth] installment under Purchase Agreement dated September 30, 1942." The four checks were written at the same time and had been removed from Parapart's checkbook. The four checks and the stubs in the checkbook were dated approximately a year prior to the dates on the stubs and checks immediately preceding and following them. Each check bore the initials of one Walter E. Kolb, a then vice-president of Colonial Trust Company and friend of Kane and Mitchell. The opening journal entry on Parapart's books was as follows: "Opening Balance - October 15, 1942 "$25,000.00 Materials (Starting Load) 2,216.80 Direct Labor 6,015.68 Overhead To - Accounts Payable $28,090.74 Loans Payable 1,141.74 Capital - Paid-in 4,000.00 To record opening balance "Explanation of Opening Balance "The item of $25,000.00 Material represents Starting Load paid to R. Morse per agreement dated Sept. 30, 1942, and is to be amortized *313 at the rate of $1.00 per pack over future production. "The item of Direct Labor represents $114.62 plus 10% for handling or $11.46 paid to Morse Furniture Co. as per agreement dated Sept. 30, 1942, and $2090.72 labor billed by Morse Furniture Co. invoice dated October 15, 1942 - No. 25957. The total labor adds up to $2,216.80. "The item of Overhead of $6,015.68 is made up by charges in agreement dated Sept. 30, 1942, with the Morse Furniture Co. of $4015.66; expenses billed by Morse in invoice No. 25955, dated Oct. 15, 1942 amounting to $303.38, and Morse invoice No. 25957 dated Oct. 15, 1942 for Overhead amounting to $696.64, and $800.00 for 80 shares of stock given Morse and $200.00 preorganization expense charged to Overhead and credited to capital account. "Accounts Payable of $28,090.74 is made up of $25,000.00 (Morse agreement Sept. 30, 1942); Morse invoice No. 25955 dated Oct. 15, 1942 amounting to $303.38; and Morse invoice No. 25957, dated Oct. 15, 1942, amounting to $2,787.36. "Loans Payable of $1,141.74 represents amount due J. Kane. "Capital represents $3,000.00 paid in by cash and $800.00 Overhead Morse item and $200.00 preorganization expense. "Note: At a *314 meeting of the Board of Directors held July 24, 1943, it was decided that the item of $800.00 for 80 shares of stock for which Morse was to pay $800.00 was a misunderstanding. Morse regarded this item as a part of the Starting Load to be added to the $25,000.00 item; and the $200.00 charged to Overhead as preorganization expense was to be paid in in cash. Correcting entries appear in Journal - page 25 (July 1943)." Petitioner's return for the year here in issue was filed on March 13, 1944, and did not include either the $25,000 item or the $800 capital gain. The notice of deficiency was dated September 3, 1952. Petitioner executed no waiver consenting to an extension of the time for assessment and collection of any deficiency. Petitioner's return was not fraudulent with intent to evade tax. Opinion RICE, Judge: Assessment and collection of the asserted deficiency here is barred unless the respondent can show by clear and convincing evidence that some part of the deficiency was due to fraud with intent to evade tax. That, he has failed to do. Petitioner testified that shortly after Parapart was organized in September 1942, Mitchell produced the four checks totaling $25,000, *315 bearing January, February, and March 1942 dates, and asked him to endorse them. Petitioner stated that Mitchell actually held the checks while they were being endorsed and told him they were only for bookkeeping purposes and would never be presented for payment. He also testified that the typed statement, to the effect that the checks were installments under a Purchase Agreement, was not on the checks when he endorsed them. Petitioner was most emphatic in denying that he ever received any part of the $25,000 of proceeds from the checks; and, on the basis of the whole record, we believe petitioner's testimony that he never received any part of the proceeds. Respondent offered no evidence to substantiate his allegation of fraud except the checks themselves and Parapart's books and records - which petitioner, incidentally, claims he never saw. So far as was brought out at the hearing, Gill, Mitchell, and Kane could have been called but were not. Both parties claimed to have made an effort to locate Louise Tiedje, but were unsuccessful. No explanation was offered as to why the checks were dated early in 1942, long before Parapart was formed. We are not satisfied that the circumstances *316 surrounding the making, endorsing, and cashing of the checks were exactly as petitioner testified. Petitioner claimed he was in Grand Rapids on the dates the checks were presented for payment in New York; and, to substantiate that claim, produced personal checks which he supposedly wrote in Grand Rapids on such dates. This, obviously, is not too persuasive evidence that he did not present the four Parapart checks for payment in New York. There are also, as respondent points out on brief, inconsistencies in petitioner's testimony as to some of the surrounding facts concerning his and his furniture company's participation in making parachute packs. But that, to some extent, is understandable after the lapse of some 11 or 12 years from the time the events in question took place and the date of the hearing. Petitioner also convinced us that his failure to report the $800 of capital gain was due to inadvertence rather than a deliberate attempt to evade tax; and we, therefore, hold that respondent has not shown by clear and convincing evidence that any part of the deficiency was due to fraud with intent to evade tax. The notice of deficiency was mailed more than three years after petitioner's *317 return was filed, and assessment and collection of any deficiency is, therefore, barred by the statute of limitation. Decision will be entered for the petitioner.